1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA

10
11

BARRY ROSEN,

                    Plaintiff,

       v.

GLOBAL NET ACCESS, LLC, AND
DOES 1 THROUGH 10,

                 Defendants.

Case No. CV 10-2721-DMG (E)

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

18
       This matter is before the Court following a bench trial which took place on July 31, 2012 through August 2, 2012.  Peter R. Dion-Kindem of Dion-Kindem & Crockett appeared on behalf of Plaintiff, Barry Rosen.  Jeffrey A. Cohen of Cohen & Richardson, PC, appeared on behalf of Defendant, Global Net Access, LLC.

       Having carefully reviewed the evidence and the arguments of counsel, as presented at trial and in their written submissions, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

# I. **FINDINGS OF FACT**

1.     Plaintiff Barry Rosen is a professional photographer.  (Rosen Decl. [Doc. # 104] ¶ 1, Dec. 13, 2011.)  Rosen owns the copyright of seven photographs entitled "Amy Weber," registration numbers VA 1-230-923 and VAu653-336, one entitled "Daisy Fuentes," registration number VA 1-230-934, and one entitled "Gena Lee Nolin," registration number VA 1-306-005.  (Rosen Decl. ¶¶ 2, 8.)

2.     On February 22, 2010, Rosen visited the website www.availablewallpapers.com and found nine of his copyrighted photographs there. (Rosen Decl. ¶ 8.)[1]  Rosen has never authorized the owners or operators of availablewallpapers.com to copy, use, exploit, publicly display, perform, or in any way distribute any of those images.  (Rosen Decl. ¶ 5.)

3.     Rosen traced availablewallpapers.com to an Internet Protocol ("IP") address located on a server owned by Defendant Global Net Access, LLC ("GNAX").  (Rosen Decl. ¶¶ 11-12; Trial Ex. ##4-6 at Rosen-000094-97, 000102-03.)  GNAX is a Georgia LLC.  (Final Pretrial Conference Order [Doc. # 117] ("Admitted Facts"), Admitted Fact #1.)  Rosen has never authorized the owners or operators of GNAX to copy, use, exploit, publicly display, perform, or in any way distribute any of those images. (Rosen Decl. ¶ 5.)

4.     GNAX owns thousands of servers, which it leases to its customers and for which GNAX provides around-the-clock support.  (Hinkle Decl. [Doc. #108-1] ¶ 9, Dec. 13, 2011.)

5.     GNAX's customers pay for dedicated space on a server maintained at one of GNAX's server centers.  (Hinkle Decl. ¶ 11.)  Those customers can subsequently use that

---

[1]     In his Declaration, Rosen alleged that on February 22, 2010, availablewallpapers.com contained 13 infringements of his copyrighted photographs.  (Rosen Decl. ¶¶ 2, 8.)  At trial, however, Rosen testified that one alleged infringement was duplicative, two were registered under certificates not introduced into evidence, and he did not recall taking one of the photographs.  (Reporter's Transcript of Proceedings, Day One, pp. 31-32, July 31, 2012; Reporter's Transcript of Proceedings, Day Two, pp. 13-14, 18-19, 38, Aug. 1, 2012.)  Thus, only nine of his copyrighted photographs are at issue.

server space to provide their own customers (known as "downstream customers") space to host a website on the Internet.  (*Id.*)

6.      Availablewallpapers.com is owned and operated by one such "downstream customer" of a company called IMHosted, which itself is a customer of GNAX.  (Hinkle Decl. ¶¶ 63, 80.)

7.      Since at least 2008, GNAX has made available on its website its policy concerning claims of copyright infringements.  (Blumenau Decl. [Doc. #108-2] ¶¶ 5-6, Dec. 13, 2011.)  That policy is incorporated into an Acceptable Use Policy ("AUP") that GNAX requires each of its customers to execute.  (Blumenau Decl. ¶ 6.)

8.      On February 22, 2010, the AUP listed on GNAX's website listed Erik Blumenau as the agent designated to receive notifications of claimed infringement.  (Trial Ex. #8 at Rosen-000014.)  The AUP also listed Blumenau's fax number, but not his e-mail address.  (*Id.*)  As of that date, the United States Copyright Office listed Blumenau as the agent designated to receive notifications of claimed infringement for GNAX and included his e-mail address.  (Trial Ex. #9 at Rosen-000017.)

9.      Upon discovering that availablewallpapers.com was located on a server owned by GNAX, Rosen drafted a letter to Blumenau (the "DMCA Notice")[2], stating that material on availablewallpapers.com infringed upon Rosen's copyrights.  (Rosen Decl. ¶¶ 14-17; Trial Ex. #10 at Rosen-000140-000143.)  At approximately 9:05pm PST on February 22, 2010, Rosen transmitted the DMCA Notice to the fax number listed on GNAX's AUP page, which GNAX received.  (Rosen Decl. ¶¶ 19-22; Trial Ex. ##10-11 at Rosen-000144-000145.)  The transmission report that Rosen's fax machine generated indicated that no communication problems occurred during transmission.  (Wilkins Decl. [Doc. #105] ¶ 16, Dec. 9, 2011.)

---

[2] "DMCA" is a reference to the Digitial Millenium Copyright Act, 17 U.S.C § 512.

10.     Rosen also drafted an e-mail version of the DMCA Notice.  (Rosen Decl. ¶ 18.)  At approximately 9:05pm PST on February 22, 2010, Rosen sent the DMCA Notice to Blumenau via e-mail.  (Rosen Decl. ¶ 23; Trial Ex. #12 at Rosen-000146-000148.)

11.     GNAX received Rosen's DMCA Notice on February 22, 2010, whether via fax or e-mail, or both.  (*Id.*)  The Court does not find GNAX's denial of receipt of Rosen's DMCA Notice to be credible.  Although Jeff Hinkle, GNAX's CEO, claimed in his Declaration that document searches performed in April 2010 turned up no e-mail from Rosen, Hinkle indicated at trial that GNAX has no formal e-mail preservation policy.  (Hinkle Decl. ¶¶ 103-109; Reporter's Transcript of Proceedings, Uncertified Real Time Draft, Day Three, pp. 99-100, Aug. 2, 2012.)  Given the backup system that GNAX had in place, any given e-mail search would not have detected an e-mail that had been deleted more than two weeks prior.  (Reporter's Transcript of Proceedings, Uncertified Real Time Draft, Day Three, p. 100, Aug. 2, 2012.)

12.     Hinkle claimed that GNAX's custom and practice is to address takedown notices within 48 hours of receipt, and that GNAX has approximately 750 records of DMCA takedown notices.  (Hinkle Decl. ¶¶ 44, 57; *see also* Blumenau Decl. ¶ 18.)  Despite requests by Rosen, however, GNAX produced none of those records during discovery.  (*See* Trial Ex. #66.)

13.     On or around April 13, 2010, Rosen discovered that the infringing photographs were still available at availablewallpapers.com and that the website was still located on a server owned by GNAX.  (Rosen Decl. ¶ 26; Trial Ex. ##13-14.)

14.     On April 27, 2010, after being served the Complaint in this case, GNAX disabled access to availablewallpapers.com and Rosen's infringed upon material therein.  (Hinkle Decl. ¶¶ 98-99.)

15.     Although Rosen testified at trial that Internet licenses of his copyrighted photographs have been sold for roughly $9,600 to $9,800 and that he would currently sell such licenses for between $10,000 and $15,000, the documentary evidence before the Court only reflects the fact that print licenses for his photographs have been sold for

-4-

between $5,000 and $10,000.  (Reporter's Transcript of Proceedings, Day One, pp. 52-57, July 31, 2012; Trial Ex. #18.)

## II.   <u>CONCLUSIONS OF LAW</u>

1.     The Court has subject matter jurisdiction because this action arises under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* and 28 U.S.C. § 1338(a).  Defendant admits that venue in the Central District of California is proper.

### <u>GNAX Contributorily Infringed Rosen's Copyrights</u>

2.     In order to recover for a claim of contributory copyright infringement, Plaintiff must prove:  (1) Plaintiff is the owner of valid copyrights; (2) third persons directly infringed Plaintiff's copyrights; (3) Defendant knew or had reason to know of the infringing activity; and (4) Defendant materially contributed to the direct infringer's infringing activity.  *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 727 (9th Cir. 2007); *see also* Model Civ. Jury Instr. 9th Cir. 17.21 (2007).

3.     Furthermore, "if a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, the operators knows of and contributes to direct infringement."  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1021 (9th Cir. 2001).

4.     Rosen is the valid owner of the nine photographs in question.  Rosen's copyrights were directly infringed upon by the owner and operator of availablewallpapers.com.

### <u>Knowledge Standard</u>

5.     Contrary to GNAX's assertions, GNAX can be held contributorily liable for copyright infringement if it knew (*i.e.*, had subjective knowledge) or had reason to know (*i.e.*, had objective knowledge) of the infringing activity.  Binding precedent makes this clear.  "Contributory liability requires that the secondary infringer 'know or have reason to know' of direct infringement."  *Napster*, 239 F.3d at 1020 (citing *Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.*, 907 F. Supp. 1361, 1373-1374 (N.D.

Cal. 1995).  In addition, Title II of the DMCA, 17 U.S.C. § 512 (2003), upon which GNAX relies to assert an affirmative defense, reflects the fact that liability can be based on a finding of either subjective or objective knowledge.  The DMCA establishes four safe harbor provisions to shield potential defendants from liability.  The third safe harbor, codified at 17 U.S.C. § 512(c), can apply only if a service provider lacks "actual knowledge that the material . . . on the system or network is infringing," § 512(c)(1)(A)(i), and "is not aware of facts or circumstances from which infringing activity is apparent," § 512(c)(1)(A)(ii).  *See Viacom Intern., Inc. v. YouTube, Inc.*, 676 F.3d 19, 31 (2d Cir. 2012) (characterizing Section 512(c)(1)(A)(ii) as  an "objective standard").  "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous." *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S. Ct. 441, 449, 151 L. Ed. 2d 339 (2001) (internal citations omitted).  If contributory liability could be based only on a finding of actual (i.e., subjective) knowledge, Section 512(c)(1)(A)(ii) would be superfluous, as there would be no reason to create a safe harbor for actions that do not create liability in the first place.  Thus, so long as a defendant knows or should have known of direct infringement, it may be held contributorily liable.

6.    GNAX knew or should have known that Rosen's copyrights were being directly infringed upon by a third party when it received Rosen's DMCA Notice by fax and e-mail on February 22, 2010.

7.    GNAX materially contributed to direct copyright infringement by failing, after learning that such material was on its system, to purge specific infringing material until April 27, 2010.

## Rosen's Claim Is Not Barred By The DMCA Safe Harbors

8.    GNAX argues that Rosen's claim is barred in whole or in part under the safe harbor provisions of the DMCA, 17 U.S.C. § 512.  The DMCA provides four safe harbors to shield potential Internet Service Provider liability:  for transitory digital network communications (§ 512(a)), system cashing (§ 512(b)), information residing on

systems or networks at the direction of users (§ 512(c)), and information location tools (§ 512(d)).  GNAX asserts that Section 512(a) and (c) provide affirmative defenses to Rosen's claim.

9.      A party asserting an affirmative defense under any of the DMCA safe harbors must first meet the requirements of Section 512(i), which, in part, requires service providers to have "adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or the network who are repeat infringers[.]"  17 U.S.C § 512(i)(1)(A).

10.      GNAX has not reasonably implemented a policy to deal with copyright infringers.  A service provider implements a policy if "it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications."  *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007).  In *CCBill LLC*, a single page from the defendant's "DMCA Log" was enough evidence for the Ninth Circuit to conclude that a repeat infringer policy was implemented.  *Id.* at 1110.  Here, despite claiming to have collected some 750 DMCA take-down notifications, GNAX did not timely produce evidence to demonstrate it actually responds to allegations of copyright infringement in an expeditious manner.  The failure to produce even a single record of a DMCA notification leads this Court to the adverse inference that no "working notification system" exists.  Thus, GNAX fails the threshold requirements of Section 512(i).

11.      Even if GNAX's AUP satisfied the threshold requirements of Section 512(i), GNAX would not meet the requirements of Section 512(a) or (c).

12.      GNAX does not qualify as a "service provider" as that term is used in Section 512(a).   Only "an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user" can qualify for safe harbor under Section 512(a).  17 U.S.C. § 512(k)(1)(A).

-7-

Section 512(a) grants immunity only "to service providers whose connection with the material is transient." *CCBill LLC*, 488 F.3d at 1116; *see also In re Charter Commc'n., Inc. v. Subpoena Enforcement Matter*, 393 F.3d 771, 776 (8th Cir. 2005) (noting that the section "limits the liability of an ISP when it merely acts as a conduit for infringing material without storing, caching, or providing links to copyrighted material"); *Recording Indus. Ass'n of America, Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1237 (D.C. Cir. 2003) (noting that the section covers activities such as "transmitting e-mails, instant messages, or files sent by an internet user from his computer to that of another internet user"). Because GNAX stores clients' data on its servers, its connection to its clients' material is not transient, and thus GNAX's affirmative defense under Section 512(a) fails.

13.     GNAX also fails to meet the requirements of Section 512(c). The safe harbor provided by Section 512(c) cannot apply where the service provider both possesses actual or objective knowledge and fails to expeditiously remove infringing material upon such knowledge. 17 U.S.C. § 512(c)(1)(A)(i)-(iii). GNAX had actual or objective knowledge when it received Rosen's DMCA Notice by fax or e-mail, or both, on February 22, 2012. By removing the infringing material some two months later, GNAX failed to act expeditiously. Thus, even assuming GNAX satisfies Section 512(i), Rosen's claim is not barred under Section 512(c).

### III.   CONCLUSION

1.     GNAX contributorily infringed upon Rosen's copyrights by failing to expeditiously purge the infringing material from its system after receiving the DMCA Notice by fax and e-mail.

2.     GNAX did not carry its burden of proving that the DMCA bars Rosen's contributory infringement claims, nor did it meet its burden on any of the other affirmative defenses it asserts.

1         3.     Rosen is entitled to a license fee for each of the nine photographs at issue.

2    The Court awards $45,000, reflecting an amount of $5,000 for each infringed photograph,

3    as well as pre-judgment interest thereon from August 3, 2012 to the date of judgment.

4         4.     Rosen may file a motion for reasonable fees and costs within 30 days from

5    the date of this Order, following compliance with Local Rule 7-3.

7    DATED:    June 20, 2014

8    _____
              DOLLY M. GEE

9        UNITED STATES DISTRICT JUDGE